FILED
IN CLERK'S OFFICE
U.S. DISTRICT COURT E.D.N.Y.
★ JUL 15 2014 ★
BROOKLYN OFFICE

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
------------------------------------------------------------x
CORY SANDERS,

       Petitioner,

  -against-

SUPERINTENDENT, GREEN HAVEN
CORRECTIONAL FACIILITY,

       Respondent.
------------------------------------------------------------x

**MEMORANDUM & ORDER**

10-cv-1025 (ENV)

VITALIANO, D.J.,

  On December 10, 2002, petitioner Cory Sanders was charged in Supreme Court, Queens County with murder in the second degree and criminal possession of a weapon in the second degree. His first trial ended in a mistrial, on December 6, 2004, when the jury failed to reach a unanimous verdict. At the second jury trial, petitioner was convicted on both counts. He was sentenced, on March 30, 2006, to a term of imprisonment of 25 years to life on the murder charge, with all other time to run concurrently. The Appellate Division, Second Department affirmed his conviction on May 13, 2008. The Court of Appeals denied him leave to appeal on August 8, 2008. Sanders then filed a motion to vacate the judgment of conviction in Supreme Court, pursuant to C.P.L. § 440.10, which was denied on April 22, 2009; the Appellate Division denied leave to appeal on August 3, 2009.

  Sanders, appearing *pro se*, then filed the instant petition, dated February 28,

1

2010, for a writ of *habeas corpus*, pursuant to 28 U.S.C. § 2254.[1] He claims that his second trial violated the Double Jeopardy Clause of the Fifth Amendment, that the trial court's failure to declare a mistrial when the jury was exposed to evidence of his criminal history violated his right to a fair trial, and that he was inadequately represented by trial counsel. Subsequently, on February 6, 2012, Sanders sought leave to amend his petition to include several more (but unexhausted) claims, as well as a stay to permit him to exhaust those new claims in state court. The Court denied that motion on March 18, 2013, holding that the newly asserted claims were time-barred. For the reasons that follow, the writ is denied and the petition is dismissed.

## Background[2]

### A. The December 9, 2002 Shooting

In 1996, petitioner's friend, Gregory Hamilton, was murdered by an unknown assailant. Six years later, on December 9, 2002, during an altercation on Guy Brewer Boulevard in Queens, Hajj Buchanan—who was rumored to have been responsible for Hamilton's murder—made a comment to Sanders about "tak[ing]

---

[1] The Court takes notice of the fact that petitioner has, since his most recent filing, been relocated to Green Haven Correctional Facility. *See Inmate Population Information Search*, N.Y. STATE DEP'T CORR. & CMTY. SUPERVISION, http://nysdoccslookup.doccs.ny.gov/GCA00P00/WIQ3/WINQ130. As a result, the Superintendent of that facility is substituted as respondent in this action. *See* Fed. R. Civ. P. 25(d). The Clerk of Court is directed to amend the caption to reflect the substitution and to direct this Order, and all subsequent correspondence, to petitioner at his new location.

[2] Because Sanders was convicted, the Court recites the facts in the light most favorable to the verdict. *See Garbutt v. Conway*, 688 F.3d 79, 80 (2d Cir. 2012).

[him] back to '96." (Tr. 485:24).³ Sanders, apparently, believed this comment to mean that Buchanan had admitted to killing Hamilton, produced a .45 caliber handgun, and shot Buchanan in the head, killing him instantly. (Tr. 437–38:22–4; 486:5–12). Sanders then fled. Later, he dismantled the weapon, discarding the pieces. *Id.*

Andrew Forrester, who was 12 years-old at the time, witnessed the shooting, and the next day was interviewed by police about what he had seen. Forrester was asked to view a lineup, where he identified Sanders as the shooter. (Tr. 295:1–5; 302–305:18–12). Following the lineup, Detectives Edward Hendrickson and Robert Reed interviewed Sanders. They told him that he had been identified by a witness. The detectives then showed Sanders a photograph depicting the scene of Hamilton's murder in 1996, at which point Sanders became "quite emotional" and confessed to killing Buchanan. (Tr. 484–86:11–12). He was then charged.

### B. The First Trial

Trial commenced on November 16, 2004. About two weeks later, on December 2, the jury began deliberations. By December 6, the third day of deliberations, the jury had sent three notes to the trial court, each advising that they were deadlocked, in spite of the trial court's repeated charge that the jurors had a duty to deliberate with a view toward reaching a verdict. (Tr. Dec. 6, 2004, 4:5–23). In their third note, the jury related that not only were they deadlocked, but that

---

³ Except where otherwise noted, citations to "Tr." refer to the transcript of proceedings in Sanders's second trial, which commenced on January 17, 2006 and concluded with sentencing on March 30, 2006. Other dated "Tr." citations refer to separate, non-consecutively paginated proceedings in the record.

"[s]ome of the jurors are scared for their life and family in giving their verdict in front of the defendant and his family." (Tr. Dec. 6, 2004, 6:8–13). The trial court then gave an *Allen* charge,[4] directing the jury to continue deliberating. (Tr. Dec. 6, 2004, 6–7:14–11). That afternoon, the jury sent another note advising that they were "deadlocked at eight not guilty and four guilty" and "resolute in [their] individual decisions." (Tr. Dec. 6, 2004, 8:21–25). Concluding that nothing more could be done, the trial court dismissed the jury and declared a mistrial. (Tr. Dec. 6, 2004, 9:9–10).

### C. The Second Trial and Post-Trial Proceedings

The second trial was of a duration similar to the first. It began on January 17, 2006, and concluded with convictions on January 30, 2006. These convictions were well-supported. The People had introduced eyewitness testimony from Forrester, forensic evidence of petitioner's fingerprints on a bottle found near the crime scene, bullets matched forensically to the murder weapon, found in petitioner's closet, and the detectives' account of the tearful confession volunteered by Sanders. *See* (Tr. 928–29:14–14). On appeal to the Second Department, Sanders argued that his conviction violated double jeopardy, the jury had been tainted by improper exposure to his past criminal history, and that he had been deprived of effective assistance of counsel. The Appellate Division affirmed. *People v. Sanders*, 51 A.D.3d 825, 858 N.Y.S.2d 291 (2d Dep't 2008). The Court of Appeals declined to hear the

---

[4] "A traditional *Allen* charge reminds the jurors about the importance of obtaining a verdict and encourages jurors to listen 'to each other's arguments' while also emphasizing that 'the verdict must be the verdict of each individual juror, and not a mere acquiescence in the conclusion of his fellows.'" *Smalls v. Batista*, 191 F.3d 272, 275 (2d Cir. 1999) (quoting *Allen v. United States*, 164 U.S. 492, 501 (1896)).

4

case. *People v. Sanders*, 11 N.Y.3d 741, 864 N.Y.S.2d 399, 894 N.E.2d 663 (2008).

As noted above, Sanders later moved to vacate his sentence, pursuant to C.P.L. § 440.10, on the ground that the trial court failed to swear the jurors in his second trial.[5] Supreme Court rejected the claim as procedurally barred, and the Appellate Division declined to hear an appeal. *See People v. Sanders*, Ind. No. 93/2003 (Sup. Ct., Queens Cty. Apr. 22, 2009). All claims raised here were fully litigated in state court, and the People do not challenge their exhaustion.[6]

## Standard of Review

Under the Antiterrorism and Effective Death Penalty Act, Pub. L. No. 104-132, 110 Stat. 1214 (1996) ("AEDPA"), a writ of *habeas corpus* shall not issue with respect to any claim that was adjudicated on the merits in state court unless the state court's decision: (1) "was contrary to," or involved an unreasonable application of, "clearly established federal law" as determined by the United States Supreme Court, or, (2) "was based on an unreasonable determination of the facts"

---

[5] Petitioner does not, however, raise this issue in the instant petition.

[6] Before federal habeas relief may be sought, a petitioner must first "exhaust" all state court remedies which may be available to him. *See Jones v. Keane*, 329 F.3d 290, 294 (2d Cir. 2003) (citing 28 U.S.C. § 2254(b)(1)(A)). "Exhaustion requires a petitioner fairly to present the federal claim in state court," *Jones*, 329 F.3d at 294, though "the exhaustion doctrine 'requires only that a petitioner present his claim once on direct or collateral review.'" *Igneri v. Vacco*, No. 95-cv-1589, 1996 WL 1088900, at *3 (E.D.N.Y. 1996) (quoting *Sanford v. Senkowski*, 791 F. Supp. 66, 69 (E.D.N.Y.1992); *Fielding v. Lefevre*, 548 F.2d 1102, 1106 (2d Cir. 1977)). Having fully litigated his claims on direct appeal, and C.P.L. § 440.10 motion, and introducing no new evidence now, petitioner has met this federal habeas threshold requirement of exhaustion.

in light of the evidence presented. 28 U.S.C. § 2254(d); *see also Gutierrez v. McGinnis*, 389 F.3d 300, 304 (2d Cir. 2004) (describing this standard as "AEDPA deference"). AEDPA's deferential review applies whenever a state court disposes of a state prisoner's federal claim on the merits, regardless of whether it gives reasons for its determination or refers to federal law in its decision. *Harrington v. Richter*, 131 S. Ct. 770, 785 (2011); *see also Sellan v. Kuhlman*, 261 F.3d 303, 312 (2d Cir. 2001). Where AEDPA deference applies, "a state court's findings of fact are 'presumed to be correct' unless rebutted 'by clear and convincing evidence.'" *Drake v. Portuondo*, 553 F.3d 230, 239 (2d Cir. 2009) (quoting 28 U.S.C. § 2254(e)(1)).

For the purposes of federal habeas review, "clearly established federal law" refers to the holdings, as opposed to dicta, of Supreme Court decisions in effect at the time of the relevant state court decision. *Williams v. Taylor*, 529 U.S. 362, 412 (2000). A state court decision is "contrary to clearly established federal law" within the meaning of § 2254(d) if it contradicts relevant Supreme Court precedent or arrives at a different conclusion based on "materially indistinguishable" facts. *Id.* at 405–06. A state court decision involves an "unreasonable application" of federal law if it "identifies the correct governing legal principle from [the Supreme] Court's decisions but unreasonably applies that principle to the facts of" the case. *Id.* at 413. In construing and applying federal law, even erroneous state court decisions, if deemed reasonable, will survive habeas review. *Id.* at 411. The state court decision need not be "so far off the mark as to suggest judicial incompetence" before habeas relief may be granted, *Francis S. v. Stone*, 221 F.3d 100, 111 (2d Cir. 2000) (internal quotations omitted), but a federal court may reverse a state court ruling only where

it was "so lacking in justification that there [is no] possibility for fairminded disagreement." *Vega v. Walsh*, 669 F.3d 123 (2d Cir. 2012) (quoting *Harrington*, 131 S. Ct. at 786–87).

## Discussion

### A. Double Jeopardy

Sanders argues that, having dismissed the jury and declared a mistrial on the third day of deliberations, the trial judge violated the Double Jeopardy Clause when the court ordered a second trial. The argument overlooks the obvious: it has been long-established that "a failure of the jury to agree on a verdict [is] an instance of 'manifest necessity' which permit[s] a trial judge to terminate the first trial and retry the defendant, because 'the ends of public justice would otherwise be defeated.'" *Richardson v. United States*, 468 U.S. 317, 323–24 (1984) (quoting *United States v. Perez*, 9 Wheat. 579, 580 (1824)); *accord Arizona v. Washington*, 434 U.S. 497, 509 (1978) ("without exception, the courts have held that the trial judge may discharge a genuinely deadlocked jury and require the defendant to submit to a second trial"). In this case, the jurors were obviously and hopelessly deadlocked after three days of deliberations. They sent four jury notes informing the trial court that they were resolute in their respective determinations.[7] (Tr. Dec. 6, 2004, 6–7:4–11). Having already given an *Allen* charge, the trial court determined that there was nothing more that could be done but to dismiss the jury and try again. This was an

---

[7] What those respective determinations were or why the jurors held them is entirely irrelevant. All that matters is that the deadlock prevented the jury from reaching a verdict.

7

entirely reasonable conclusion. Moreover, even if it were not, the Second Department concluded that "the jury appeared to be genuinely deadlocked, and it would have served no purpose to require it to continue deliberations . . . [and thus] the court providently exercised its discretion in declaring a mistrial." *Sanders*, 51 A.D.3d at 826 (internal citations omitted). By any standard of review, much less AEDPA deference, that determination by the state courts was hardly unreasonable. Plainly, there was no error in mistrialing the first effort and retrying Sanders a second time. Equally, there is absolutely no merit in petitioner's double jeopardy claim. It is dismissed.

## B. Denial of Mistrial Applications

Substantively attacking the fairness of the second trial, Sanders argues that his due process right was violated by a series of missteps during the testimony of Pedro Martinez, a Department of Corrections counselor, and that the trial court compounded the error and abused its discretion in denying his follow-up applications for mistrial. In particular, Sanders claims that his criminal history was improperly disclosed to the jury, and that no curative instruction could have corrected the taint. The meat of the complaint is that, when Martinez was first called as a witness, he was identified as a "corrections counselor" by a court officer, prompting the first motion for a mistrial by the defense. The trial court denied the motion, instructing the jury to "disregard the reference." (Tr. 822–23:23–18). Martinez went on, in his testimony, to note that Sanders "was in supervision" and that his business card, which Sanders had possessed, was one that would have been "given to an inmate." (Tr. 827:3–19). Before he could continue, Martinez was

8

interrupted by the trial court, which struck the answer from the record, but denied Sanders's second application for a mistrial. (Tr. 827–28:17–8).

According to Sanders, from these errors flowed an extremely prejudicial inference. The argument has some resonance in New York jurisprudence. *See People v. Cuiman*, 229 A.D.2d 280, 284–85 (1st Dep't 1997) (testimony that defendant had an arrest photo "fatally compromised" the fairness of trial). However, the Second Department, on the facts here, rejected petitioner's argument, holding that "any prejudice was alleviated by the court's prompt curative instructions." *Sanders*, 51 A.D.3d at 826. The cleansing power of curative instructions also has resonance in New York law. *See People v. Smith*, 299 A.D.2d 500, 500, 749 N.Y.S.2d 739 (2d Dep't 2002) (finding that prejudice was overcome by curative instruction when witness testified to bringing defendant "back to Riker's Island"); *People v. Boston*, 296 A.D.2d 576, 577, 746 N.Y.S.2d 28 (2d Dep't 2002) (instead of declaring a mistrial in such a case, "[t]he trial court providently exercised its discretion in giving the jury a curative instruction"). Putting aside AEDPA deference for the moment, it is hard to say, following these curative instructions, that if allusion to Sanders's involvement in a past, uncharged crime had injected prejudice into the evidentiary mix, any measure of it remained. Nor, especially in the totality of the evidence, that denial of the mistrial application was somehow constitutionally improper. Certainly, it remains "unlikely that the 'uncharged crime' evidence which [Sanders] disputes deprived him of a fundamentally fair trial." *Clanton v. Rivera*, No. 06-civ-475, 2008 WL 2839712, at *21 (S.D.N.Y. 2008), *report and recommendation adopted*, No. 06-civ-4756, 2010 WL

1685414 (S.D.N.Y. 2010); *see also Oakley v. Artuz*, No. 95-cv-2088, 1999 WL 325362 at *2 (E.D.N.Y. 1999) (habeas relief inappropriate where "record contained overwhelming evidence of Petitioner's guilt" in spite of improper criminal history evidence).

With similar certitude, the evidence that Sanders shot and killed Buchanan as charged is overwhelming. An eyewitness—who observed the murder in broad daylight—identified Sanders as the killer, and Sanders himself confessed to the crime. There was forensic evidence, too. Indeed, a deprivation of due process is not typically found upon the admission of improper evidence unless such evidence "was sufficiently material to provide the basis for conviction or to remove a reasonable doubt that would have existed on the record without it.'" *Johnson v. Ross*, 955 F.2d 178, 181 (2d Cir. 1992) (quoting *Collins v. Scully*, 775 F.2d 16, 19 (2d Cir. 1985)). The contentions Sanders advances do not approach the standard for relief. The Appellate Division has found no deprivation of any constitutional right in the trial court's decisions to give the curative instructions it gave and its denial of a mistrial. Even without—but surely with—AEDPA deference, these determinations are by no means an unreasonable application of controlling United States Supreme Court precedent. The writ will not issue on this ground.

### C. Ineffective Assistance of Counsel

Finally, Sanders argues that he was denied effective assistance of trial counsel, generally, by his attorney's lack of preparation for trial, and, specifically, when he (1) failed to object to alleged *Trowbridge* violations created by the testimony of Detectives Reed and Hendrickson; (2) failed to impeach the eyewitness; and (3)

elicited testimony, tending to favor the prosecution, that other, non-testifying eyewitnesses had also implicated Sanders in the shooting.

In order to prevail on a claim of ineffective assistance, a petitioner must "meet both a 'performance' test, showing that counsel's representation 'fell below an objective standard of reasonableness,' and a 'prejudice' test, demonstrating that 'there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different.'" *Palacios v. Burge*, 589 F.3d 556, 561 (2d Cir. 2009) (quoting *Strickland v. Washington*, 466 U.S. 688, 694 (1984)); *see also Cullen v. Pinholster*, 131 S. Ct. 1388, 1404 (2011), *reh'g denied*, 131 S. Ct. 2951 (2011) ("[R]easonable probability" has been defined as "a 'substantial,' not just 'conceivable,' likelihood of a different result." (quoting *Harrington*, 131 S. Ct. at 791)). Because of the inherently deferential nature of the *Strickland* standard, "[a] criminal defendant has a high burden to overcome to prove the deficiency of counsel." *Lynn v. Bliden*, 443 F.3d 238, 247 (2d Cir. 2006). For habeas petitioners, this burden is "enhanced by the hurdle posed by the highly deferential review accorded state court adjudications under [AEDPA]." *Mosby v. Senkowski*, 470 F.3d 515, 519 (2d Cir. 2006) (quoting *Eze v. Senkowski*, 321 F.3d 110, 112 (2d Cir. 2003)); *see also Pinholster*, 131 S. Ct. at 1403 (The standard of review for ineffective assistance claims in the habeas context is "doubly deferential" because courts take a "highly deferential look at counsel's performance through the deferential lens of § 2254(d)." (internal citations omitted)).

1. *Failure to Object to* Trowbridge *Violations* [8]

In the telling of their interview with Sanders, Detectives Reed and Hendrickson explained that, before Sanders confessed, and to encourage his cooperation, they told him that he had been identified in a lineup. *See* (Tr. 482:4–17, 561–62:17–2). Sanders mischaracterizes this testimony as testimony *about* the lineup that offered to bolster the identification itself—a violation of *Trowbridge*. In the accurate context of the People's proffer, the *Trowbridge* objection Sanders claims his attorney should have interposed would not lie. To start, *People v. Brown*, holds that where the testifying "officers did not testify that [a specific witness] had identified defendant," there is no *Trowbridge* violation. 115 A.D.2d 485, 485, 495 N.Y.S.2d 716 (2d Dep't 1985). Again, the detectives' testimony was not offered to bolster the testimony of the eyewitness as to his identification of Sanders in the lineup identification testimony, or to suggest that Sanders was arrested *because* of the lineup,[9] but to explain what changed Sanders's story and led to his confession.

Nonetheless, even if this testimony amounted to a violation of *Trowbridge*, the failure of counsel to object cannot constitute ineffective assistance of counsel, for the error, especially in light of petitioner's confession, would not be sufficiently

---

[8] In *People v. Trowbridge*, New York's high court held that, under New York law, only a witness himself may testify to his own prior identification; no other witness may bolster or testify to that identification. 305 N.Y. 471, 476–77, 113 N.E.2d 841 (1953), *superseded in non-relevant part by* C.P.L. § 60.25.

[9] In contrast, when a detective testifies to the effect that a "defendant was arrested as a result of the witness' identification of him," that testimony would constitute "improper, inferential bolstering of the identification testimony" under *Trowbridge*. *People v. Stanley*, 185 A.D.2d 827, 828, 586 N.Y.S.2d 649 (2d Dep't 1992). No such testimony was given here.

12

prejudicial to satisfy the second element of *Strickland*. Indeed, in New York, "[b]olstering [of another's eyewitness identification] by a police officer alone rarely constitutes reversible error, except where there is a danger that the jury will take the police officer's testimony as a substitute for identification by the eyewitness or if undue prominence is given to the bolstering testimony." *People v. Middleton*, 159 A.D.2d 350, 351, 552 N.Y.S.2d 629 (1st Dep't 1990); *accord Franco v. Lee*, No. 10-cv-1210, 2013 WL 704655, at *9 (E.D.N.Y. 2013) (though "bolstering is not permissible under New York law, it 'cannot be equated with police testimony improperly implying that a witness who was not brought to testify did in fact implicate the defendant'" and is therefore understood to be harmless in light of substantial evidence of guilt (quoting *People v. Polidore*, 181 A.D.2d 835, 837, 581 N.Y.S.2d 827 (2d Dep't 1992)) (internal citations omitted)).

In sum, at best New York law would have given trial counsel only a faint hope that his objection would be sustained. A failure to grasp for that straw would not be second-guessed on *Strickland*'s first prong. But, as a consequence of a legion of New York cases holding actual, not merely arguable, *Trowbridge* violations to be harmless in the context of, as here, mountainous evidence of guilt, the claim that counsel's failure to object established constitutional ineffectiveness of counsel would never survive *Strickland*'s prejudice prong. Most dispositively, that the state courts found no support on this point for Sanders's ineffectiveness claim cannot be disturbed upon an application of AEDPA deference.

2. *Failure to Impeach Forrester*

Sanders also takes issue with his counsel's failure to impeach Forrester, the

young eyewitness, with inconsistencies in his testimony. During Sanders's second trial, Forrester testified that he had the opportunity to see Sanders's face for about "two or three minutes" before and immediately after the shooting, and that Sanders had short hair at the time. (Tr. 294:16–20; 330:6–9). In his brief to the Appellate Division, however, Sanders noted that "at the first trial, Forrester had testified that he saw the shooter for mere seconds" and "the shooter's hair and face were covered by a hat and hood." (Pet. Mem. 45, App. Div. No. 06-03820).

It is well-settled, though, that "[d]ecisions about whether to engage in cross-examination, and if so to what extent and in what manner, are . . . strategic in nature and generally will not support an ineffective assistance claim." *Edmonson v. Artus*, No. 04-cv-5477, at *14, 2006 WL 3486769 (E.D.N.Y. 2006) (quoting *Dunham v. Travis*, 313 F.3d 724, 732 (2d Cir.2002)) (alterations in original). A failure to capitalize on every possible opportunity to assault the credibility of a witness is hardly an objective failure of reasonableness for the purposes of *Strickland*. As the Supreme Court has observed, "[f]or judges to second-guess reasonable professional judgments and impose on appointed counsel a duty to raise every 'colorable' claim suggested by a client would disserve the very goal of vigorous and effective advocacy." *Jones v. Barnes*, 463 U.S. 745, 754 (1983). Indeed, a claim of ineffective assistance, "necessarily retrospective, requires proof of true ineffectiveness rather than mere disagreement with strategies and tactics that failed," especially when "overwhelming evidence indicating defendant's guilt . . . unquestionably challenged the resources of trial counsel." *People v. Benn*, 68 N.Y.2d 941, 942, 502 N.E.2d 996 (1986); *accord United States v. Sugar*, 4 F. App'x 18, 20 (2d Cir. 2001) (affirming

conviction over ineffectiveness claims where "[s]everal of counsels' alleged errors were no more than plausible strategic decisions [and] as to those decisions by counsel that were not as likely to have been strategic, any possible errors were surely harmless given the overwhelming evidence of appellants' guilt").

Sanders, of course, has now seized on the unexplored inconsistences in Forrester's testimony as fatal chinks in the People's case which only an unconstitutionally ineffective lawyer would overlook. Still, his trial counsel aggressively and ably pursued many *other* avenues in cross-examining (and impeaching) Forrester. Counsel elicited extended testimony about the considerable distance between Forrester's point of observation and Sanders's location. (Tr. 324–29:23–15). He caused Forrester to invoke the Fifth Amendment.[10] (Tr. 315–16:11–24). Counsel successfully impeached Forrester about whether Sanders was wearing a hat or hood, (Tr. 341–42:12–23); and he drew testimony from Forrester which would later be contradicted by the testimony of other prosecution witnesses. *See, e.g.*, (Tr. 356:2–17, 701–02:20–02). Eliciting that Forrester had less time to see Sanders's face than the very short time he said he had, or that his memory was fuzzy, after four years, about what type of headwear Sanders may or may not have been sporting when he killed Buchanan, would not, in any event, change the fact that, in the teeth of a different line of impeachment, Forrester stuck to his testimony that he had identified Sanders at a lineup in 2002 and identified him again in court in 2005 and 2006. Nor do the unasked questions change the fact that Sanders

---

[10] At the time of trial, Forrester was facing charges of theft in Maryland relating to an incident in 2005. *See* (Tr. 276:4–9, 315:11–13).

15

himself confessed to the crime, presenting counsel his chief and insurmountable hurdle.

The short of it is that counsel's efforts to undermine Forrester's credibility were quite thorough. That those efforts did not include everything on petitioner's complaint list, in the totality of the circumstances here, does not matter a whit under *Strickland*. It is clear beyond all cavil that the rejection by the state courts of Sanders's ineffective assistance of counsel claim on this item of complaint was neither contrary to, nor involved an unreasonable application of, federal law, whether considered *de novo* or with AEDPA deference.

### 3. *Eliciting Testimony Favoring the Prosecution*

Relatedly, Sanders takes aim at certain testimony that his counsel seemed to purposefully elicit, which, in hindsight, arguably tended to favor the prosecution's case. Highlighted is counsel's questioning, in cross-examining Detective Reed, which elicited evidence that William Verdon—a friend of Forrester's who had been with him that afternoon—had also identified Sanders in a lineup. (Tr. 601:8–19). But, on the other hand, this line of questioning revealed, at the same time, the fact that Shavona Trapper—who had been with Forrester and Verdon—had *failed* to identify Sanders in the lineup. (Tr. 598:6–13). Additionally, counsel led Detective Reed to confirm that Verdon had only seen Sanders running from the scene, not actually committing the crime, which diminished the value of his identification, and Forrester's by implication. (Tr. 601:21–24).

What jumps out is that there was rhyme and reason in defense counsel's plan. "In case after case," the Second Circuit has "declined to deem counsel ineffective

notwithstanding a course of action (or inaction) that seems risky, unorthodox or downright ill-advised." *Tippins v. Walker*, 77 F.3d 682, 686–87 (2d Cir. 1996) ("Of course, the buried assumption in our *Strickland* cases is that counsel is present and conscious to exercise judgment, calculation and instinct, for better or worse"); *see also Cuevas v. Henderson*, 801 F.2d 586, 590 (2d Cir. 1986), *cert. denied*, 480 U.S. 908 (1987) (no ineffective assistance where counsel's questioning "opened the door" to damaging evidence). Even if it proved counterproductive, and that is hard to say here even in hindsight, Sanders's trial counsel had a clear strategy in pursuing this line of questioning: to blur the clarity and conclusiveness of all eyewitness testimony.

In addition to pinpoint complaints, petitioner scatters in his papers general complaints about his trial counsel's preparation, judgment, and canniness. None of these grumbles, specific or general, singularly or collectively, establishes that his trial counsel was constitutionally deficient. Even though some grumbles might, in retrospect, give pause on *Strickland*'s first prong, success on the second prong is well beyond Sanders's reach. The conclusion of the state courts that counsel was not ineffective cannot, especially under AEDPA's "doubly deferential" standard of review, be deemed unreasonable or in conflict with federal law. As such, Sanders's claim of ineffective assistance of counsel must, and does, fail on this application as well.

## Conclusion

For the foregoing reasons, the writ of *habeas corpus* sought by Sanders is denied and his petition is dismissed.

Since petitioner has not made a substantial showing of the denial of a constitutional right, a certificate of appealability shall not issue. 28 U.S.C. § 2253(c)(2).

Additionally, the Court certifies pursuant to 28 U.S.C. § 1915(a) that any appeal from this Order would not be taken in good faith, and, therefore, *in forma pauperis* status is denied for the purpose of any appeal. *See Coppedge v. United States*, 369 U.S. 438, 444–45 (1962).

The Clerk of Court is directed to enter judgment in favor of respondent and to close this case.

SO ORDERED.

Dated: Brooklyn, New York
June 24, 2014

s/Eric N. Vitaliano

ERIC N. VITALIANO
United States District Judge